## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-cv-21094-KMW

UNITED STATES OF AMERICA *ex rel.*
GERRY PHALP and MATT PEOPLES,

      Plaintiffs,

v.

LINCARE HOLDINGS, INC. and
LINCARE, INC. *d/b/a* DIABETIC EXPERTS
OF AMERICA,

      Defendants.

_____/

### ORDER

**THIS MATTER** came before the Court on Relators Matt Peoples and Gerry

Phalp's motion for partial summary judgment (DE 217) and Defendants Lincare

Holdings, Inc. and Lincare, Inc.'s motion for summary judgment.  (DE 220).  Both

motions are fully briefed.  Also before the Court is Relators' fully briefed motion seeking

leave to supplement (DE 294) their summary judgment briefing with previously

unpleaded facts.  Relators contend that those facts demonstrate that outbound sales

calls were made by Diabetic Experts of America[1] to customers of non-party Med4Home,

Inc., which relied on the Holdings database for predicate information to make those

calls.

---

[1] Lincare, Inc. did business as Diabetic Experts of America.  In the July 13, 2015 summary judgment order, the Court found that Diabetic Experts of America was a subpart of Lincare, Inc. and not a separate supplier.  (DE 283 at 46).  Nevertheless, as in the previous summary judgment order, the Court refers to Lincare, Inc. and Diabetic Experts of America separately in order to address the Parties' arguments.  Diabetic Experts of America is referred to here as "Diabetic Experts" or "Diabetic"; Lincare, Inc. is referred to as "Lincare"; Lincare Holdings, Inc. is referred to as "Holdings."

I.     BACKGROUND

        In Count I of the Second Amended Complaint ("SAC"), a presentment claim,

Relators seek recovery from Diabetic Experts for the claims it presented to the

government derived from telemarketing of Medicare beneficiaries in violation of 42

U.S.C. § 1395(m)(a)(17).  In Count II, a make-or-use claim, Relators argue that

Holdings provided Diabetic Experts with improper sales leads generated from Holdings'

database of patient information and that Diabetic Experts used those leads to make the

calls alleged in Count I.  (DE 285).

        The Court assumes familiarity with the July 13, 2015 order (the "July Order")

granting Defendants' motion for summary judgment on the six threshold exemplars

("Original Exemplars").  (DE 283).  Following that order granting partial summary

judgment in favor of Defendants, the Parties submitted a joint status report outlining

what claims may remain.  (DE 285).  Defendants assert that the July Order resolves all

viable claims in the SAC, that the Court need not address the pending motions, and that

the Court should enter judgment in their favor.  Relators contend that the SAC's claims

arising out of Diabetic Experts' unsolicited sales calls to customers of Med4Home and

Lincare Pharmacy Services Inc. d/b/a Reliant Pharmacy ("Reliant") are unaffected (or

even bolstered) by the Court's previous summary judgment analysis.

        Relators affirmatively seek summary judgment against both Diabetic Experts and

Holdings on the claims submitted for payment to the government derived from outbound

telemarketing calls, but concede that issues of fact regarding Defendants' knowledge

preclude summary disposition in their favor on the scienter element.[2]  Defendants argue

_____

[2] In the July Order, the Court found, as an alternative and independent ground for partial
summary judgment in favor of Defendants on the Original Exemplars, that there was no record

that if any claims are properly before the Court, Defendants are nonetheless entitled to summary judgment because they had written consent to make telephone contact.  After careful consideration of the arguments presented in the motions for summary judgment pending before the Court, and in the context of the July Order, the Court allows that while the claims concerning Med4Home can be read into the broad language of the SAC,[3] the Court concludes that those claims cannot survive a summary judgment challenge.

### A.   Relators' Motion to Supplement

The remaining dispute[4] in this False Claims Act case concerns Diabetic Experts' telemarketing of its diabetic testing supplies to Medicare beneficiaries who were

---

evidence presented to support a jury finding that Defendants had scienter for those claims.  (DE 283).  Relators do not ask the Court to reconsider that conclusion, but instead argue that the scienter finding is inapplicable to any Med4Home claims.  (DE 285 at 7).  By virtue of the conclusions reached below, the Court need not consider the Parties' arguments regarding scienter as to the New Exemplars.  Similarly, Defendants' additional arguments that the claims should be time limited and confined to the Original Exemplars in the SAC are moot.

[3] Med4Home is not explicitly included in the SAC.  Med4Home is, nevertheless, a subsidiary of Defendants and Relators did allege generally that Diabetic Experts impermissibly called customers of Defendants' subsidiaries.  (DE 43).  However, the Court found at the August 21, 2015 status conference that the SAC contained no theory of liability regarding the purchase of sales leads from Alliance or any other third party and that Relators may not pursue that unpleaded theory in this case.  Defendants accurately observed that "[t]he potential source of leads under Relators' SAC theory is exclusively limited to the referrals allegedly generated from the Lincare Holdings' database."  (DE 285 at 11).  As the Eleventh Circuit remarked in *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, "It is too late for [relator] to switch horses now."  *Mastej*, 591 F. App'x 693, 710 (11th Cir. 2014).

[4] Save for a brief mention, the false assignment of benefits ("AOB") argument is absent from Relators' supplement.  (DE 294).  Because there is no direct evidence indicating that claims actually were submitted using Med4Home or Reliant AOBs, the Court treats those claims as waived, or alternatively, as disposed of for the reasons set forth in the July Order.  Likewise, the Court declines to separately consider Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) because it is specifically addressed to "Relators' AOB theory."  (DE 222 at 5).

Furthermore, despite Relators' claims that Diabetic Experts placed unsolicited telephone calls to Reliant customers, sold them diabetic testing supplies, and billed the government, it is undisputed that no Reliant exemplars are presented.  Absent exemplar evidence, as discussed

customers of Med4Home.  The July Order rendered many of the facts presented in the Parties' respective summary judgment motions irrelevant to the disposition of the remaining issues.  To fill this vacuum, Relators request permission to supplement the summary judgment record with three new exemplars ("New Exemplars").[5]  The Original Exemplars at issue in the July Order concerned Diabetic Experts' practice of contacting Lincare customers and submitting claims to the government based on Lincare AOBs.  In the July Order, the Court found that the telephone contacts specifically identified in the SAC came within an exception to the statute and did not support False Claims Act liability because 1) Diabetic Experts was not a separate supplier and 2) Lincare had sold an item of DMEPOS[6] to the Original Exemplar beneficiaries within fifteen months of the telephone contacts in question.   (DE 283 at 46).  Now, Relators assert that the New Exemplars sustain their claims.  Furthermore, they argue that, even absent exemplars, Relators' "direct, personal knowledge of Diabetic's unsolicited telemarketing campaign of Med4Home beneficiaries," is sufficient to proceed to trial.  (DE 303 at 11).

Defendants argue that Relators have expanded their claims as their case has evolved through discovery and motion practice and that by presenting the New Exemplars, Relators are pursuing an unpleaded theory of liability.  Relators respond that they have not asserted a new theory, which the Court has determined will not be

---

below, Relators lack sufficient personal knowledge concerning claims submission and billing to support claims based on Reliant transactions.  Accordingly, the Court focuses on the allegedly improper telemarketing to Med4Home customers.

[5] Relators also wish to submit supplementary evidence of the fact that Med4Home is not a subpart of Lincare—as distinguished from Diabetic Experts—but rather is a separate entity.  As discussed in greater detail below, because the New Exemplars contain consents to contact, this point is not germane to the Court's analysis.

[6] "DMEPOS" is durable medical equipment, prosthetics, orthotics, and supplies.

allowed,[7] but instead have articulated additional instances of fraud under the original theory of liability.  This argument is problematic because the course of these proceedings indicates that Relators' theory has not, in fact, been consistent throughout the case.

The Court has reviewed Relators' initial disclosures to the government and the inarguable focus of those disclosures is the allegedly misleading bundling of diabetic test strips with a free diabetes blood sugar monitor.  (DE 306-1; 306-2).  There is no discussion of telephone contact being improper for failure to comply with the statutory or regulatory supplier standards.  (DE 306-1; 306-2).  And, although Med4Home and Reliant are mentioned in passing, the disclosures are explicit that "[t]he sole targets for the solicitations are Lincare's respiratory equipment patients who are covered by Medicare"[8] and "100% of our sales leads were from Lincare's database or respiratory services customers."[9]  The Peoples disclosure contains no reference to Med4Home[10] or Reliant and makes clear that "[Peoples's] job was to contact the Lincare respiratory services customers and sell them the diabetic monitoring equipment."  (DE 306-2 at 3). Nevertheless, drawing all reasonable inferences from the record and the arguments in favor of Relators, the Court will treat the disclosures as consistent with claims represented by the New Exemplars.

---

[7] *See, e.g., United States ex rel. Graves v. Plaza Med. Centers Corp.*, Case No. 10-23382-CIV, 2014 WL 5040284, at *4 n.4 (S.D. Fla. Oct. 8, 2014) (Moreno, J.); *Mastej*, 591 F. App'x at 710.

[8] (DE 306-1 at 5).

[9] (DE 306-2 at 3).

[10] Med4Home only appears on Matt Peoples's resume.  There is no mention of Med4Home or Reliant in his disclosure.  (DE 306-2).

Federal Rule of Civil Procedure 56(e)(4) permits a Court to enter an appropriate order that is "designed to encourage proper presentation of the record."  *See* Advisory Committee Note (2010) to FED. R. CIV. P. 56(e)(4).  Accordingly, Relators' motion to supplement (DE 294) is granted and Relators' supplement, Relators' briefing, and Defendants' response are considered here.  Relators have pointed out that "[t]his targeted evidence squarely responds to the Court's exemplar and subpart inquiries that arose in connection with the July 13, 2015 Order."  (DE 303 at 2).  Thus, except where they have referenced previous statements of material facts and attendant exhibits, this supplemental briefing contains the essential facts, which are not subject to genuine dispute, for the Court's discussion.

**B.**    **New Exemplars**

As evidence of the viability of their remaining claims, "Relators submit three exemplars of unsolicited, outbound telemarketing calls to Med4Home customers, including evidence of the calls and the corresponding billing to Medicare."  (DE 294 at 2; DE 294-6; DE 295-4; DE 295-5).  These New Exemplars, Relators claim, show that Diabetic Experts called Med4Home customers to sell diabetic supplies and then billed the government for the initial shipment, as well as subsequent reorders.

The first New Exemplar provided by Relators ("New Exemplar 1") is a redacted screenshot of a Diabetic Experts customer service interface that reflects contact with a customer made by Diabetic Experts sales representative Ina Schaefer between May and August of 2009.  (DE 294-6 at 2).  Although there is no supporting documentation demonstrating submission to or payment by the government, there are two unattributed and unauthenticated handwritten notations at the bottom of the exhibit page reading

"Medicare paid $192.98 on 6/5/09" and "Unicor paid $48.24 on 8/17/09." (DE 294-6 at 2).

Defendants point out that the screenshot also indicates that "[patient] gets $O^2$ from LC." (DE 294-6 at 2). Defendants submit the affidavit of corporate compliance officer Jenna Pedersen as evidence that "LC" stands for Lincare, that New Exemplar 1 reflects data for a Lincare and not a Med4Home patient, and that Lincare made a sale to that beneficiary in the fifteen months preceding the May telephone contact. (Jenna Pedersen Oct. 13, 2015 Affidavit DE 301-1 ¶¶ 4–7). The Pedersen Affidavit also provides an AOB signed by the beneficiary. (DE 301-1 at 7). That AOB is titled:

**Lincare**
**Patient Agreement and Consent.**

(DE 301-1 at 7). It includes a broadly worded consent allowing the beneficiary to be contacted by "supplier [Lincare] and its affiliates."[11] (DE 301-1 at 7). Relators do not rebut Defendants' characterization of New Exemplar 1 as a Lincare customer who was supplied by Diabetic Experts.

The second New Exemplar ("New Exemplar 2") contains records of a February 2008 call made by Diabetic Experts sales representative Cari Scales. (DE 295-4 at 7). An October 14, 2008 communication from Centers for Medicare & Medicaid Services ("CMS") Benefit Integrity Support Center demonstrates that charges were submitted under Diabetic Experts' identifying number for service dates from October 2 through December 31, 2008. (DE 295-4 at 4–5). New Exemplar 2 also contains an AOB. (DE 295-4 at 6). That AOB is titled:

---

[11] An "affiliate" as that term is defined by CMS means a person or organization that is related to another person or organization through a compensation arrangement or ownership. 42 C.F.R. § 424.57(a).

**Lincare and its affiliates**
**Patient Agreement and Consent.**

(DE 295-4 at 6).  It, too, includes a broadly worded consent allowing the beneficiary to

be contacted by "supplier [Lincare] and its affiliates."  (DE 295-4 at 6).

The third and final New Exemplar ("New Exemplar 3") contains records of a

March 2008 call made by Diabetic Experts sales representative Maxine Fleming.  (DE

295-5 at 7).  A September 29, 2008 communication from Noridian[12] indicates that

charges were submitted under Diabetic Experts' identifying number for service dates

from August 6 through November 4, 2008.  (DE 295-5 at 4–5).  New Exemplar 3 also

contains an AOB.  (DE 295-5 at 6).  That AOB is titled:

**Lincare and its affiliates**
**Patient Agreement and Consent.**

(DE 295-5 at 6).  As with the two previous AOBs, it includes a broadly worded consent

allowing the beneficiary to be contacted by "supplier [Lincare] and its affiliates."  (DE

295-5 at 6).

While the Court noted in the July Order that some of the Original Exemplar AOBs

lacked consent language, those Original Exemplars are no longer at issue.

Furthermore, the Court did not explore the consent issue at that time.  The Court

conducted a thorough analysis of a separate exception to the statute and concluded

that it applied to all six of the Original Exemplars, which were presented as

characteristic of the claims pleaded in the SAC.  Here, it is undisputed that all three of

the New Exemplars contain consents to contact.

---

[12] CMS enters into agreements with "DME MACs" to administer certain aspects of Medicare.
*See* 42 U.S.C. § 1395u(a).  Noridian is a DME MAC.

C.    **Relators' Personal Knowledge**

Relators insist that even if the New Exemplars are insufficient, Phalp and

Peoples "have direct, personal knowledge of Diabetic's unsolicited telemarketing

campaign of Med4Home beneficiaries." (DE 303 at 11; DE 294-5 ¶ 5; DE 297 ¶ 15).

Phalp states that he worked at Diabetic Experts from October 2008 to October 2009.[13]

(DE 294-5 ¶ 5).  Phalp's resume reflects that he worked for "Lincare/Med4Home

Pharmacy/Diabetic Experts of America" during that time period.[14]  (DE 217-17 at 2).

Phalp's deposition testimony demonstrates that he knew, generally, about the

practice of calling Med4Home customers on behalf of Diabetic Experts.  Phalp

explained that he made outbound calls using "Med4Home leads," because "[c]ustomers

who were Med4Home customers were also customers we were allowed to call on."

(Gerry Phalp Oct. 16, 2014 Deposition DE 217-13 at 175:7–15).  Although Phalp did not

"specifically remember calling on Med4Home patients," he did recall that those leads

could be "called on through an internal database" by "pull[ing] up a computer screen,"

that had been "made available to [him]." (DE 217-13 at 175:20–22; 178:1–6).  Phalp

has also submitted a declaration stating that he has personal knowledge that Diabetic

---

[13] Peoples worked for a slightly shorter time, from December 2008 until October 2009.  (Matt
Peoples October 17, 2014 Deposition DE 142-3 40:24–41:2).

[14] Notably, Peoples's resume does not say that he worked for Diabetic Experts at all; he worked
for "Med4Home (subsidiary of Lincare)."  (DE 306-2 at 8).  Relators' confusion regarding
corporate organization generally and the specific question of what entity they worked for runs
throughout the summary judgment record.  Relators assert that before the relevant time period,
Diabetic Experts operated as an extension of Med4Home.  (DE 229 ¶ 6).  Defendants' corporate
compliance officer, Jenna Pedersen, unequivocally stated that there was never an entity
operating as "Med4Home doing business as Diabetic Experts of America."  (DE 241 ¶ 6; Jenna
Pedersen Nov. 20, 2014 Deposition DE 241-9 at 125:20–126:6).  In any case, as described in
the July Order, Diabetic Experts was a subpart of Lincare during the relevant time period.  (DE
283 at 46) ("Therefore, the Court concludes as a matter of law that Diabetic Experts was not a
separate supplier from Lincare, and was, instead, doing business as a subpart of Lincare in
Missouri.").

Experts sales representatives placed calls to customers of Med4Home, using the Holdings database to facilitate those calls.  (DE 294-5).

Phalp's declaration expands on, and loosely comports with, his deposition testimony that although he recalled only "one lady who primarily worked on Med4Home leads . . . [and he] wasn't usually seated close to her to know what her process may have entailed," there were calls being made from the Diabetic Experts call center to Med4Home customers.  (DE 217-13 at 176:13–22).  Thus, despite his ignorance of his colleagues' process, Phalp claims to be certain that calls were being made to Med4Home customers.  Phalp also states that the call notes attached to his declaration reflect a transaction that arose out of an unsolicited phone call by Diabetic Experts sales representative Schaefer to a Med4Home beneficiary.  (DE 294-5 ¶¶ 7–8).  The transaction that Phalp references is New Exemplar 1 and appears to involve a Lincare, rather than a Med4Home, beneficiary.  (DE 294-5 ¶¶ 7–8; DE 301 at 19).

Although he could not remember at his deposition whether Schaefer was the only Diabetic Experts representative who called Med4Home customers,[15] Phalp stated in his declaration, which he signed and filed after the July Order, that he observed three representatives making calls.  (DE 294-5 ¶ 5).  He attributed this change in testimony to a lapse in memory that was remedied after having his recollection refreshed (after the Court's July Order) by reviewing his April 2010 call notes provided to the government and reviewing the July 30, 2014 declaration of Maxine Fleming.  (294-5 ¶ 4).

During his time at Diabetic Experts, Phalp personally observed Diabetic Experts representatives Fleming, Schaefer, and Scales making sales calls like the ones

---

[15] "She was the one who did it primarily.  There may have been others.  I don't know."  (Gerry Phalp Oct. 16, 2014 Deposition DE 217-13 at 178:20–22).

demonstrated by the New Exemplars.  (294-5 ¶ 6).  These observations are, however,
limited by the disclaimer Phalp made during his deposition.  When questioned regarding
the "procedures that others may have used in calling on Med4Home's patients," Phalp
cautioned "I don't know that I can speak accurately about someone else's process."
(DE 217-13 at 176:6–12).

There are temporal limitations to Phalp's knowledge as well.  Phalp cannot have
first-hand personal knowledge of the initial outbound sales calls made in New
Exemplars 2 and 3: the phone contact presented in New Exemplar 2 took place in
February 2008 (DE 295-4 at 7) and the phone contact presented in New Exemplar 3
took place in March 2008 (DE 295-5 at 7).   According to his declaration, Phalp began
work in October 2008.  (DE 294-5 ¶ 5).  The call presented in New Exemplar 1 did,
however, take place during the time that Phalp worked at Diabetic Experts.  And it is
undisputed that Phalp worked at Diabetic Experts at a time when Scales, Fleming, and
Schaefer worked there.  Therefore, he could have personally observed sales
representatives of Diabetic Experts making calls to customers of Med4Home, but he
could not have observed the initial calls that generated New Exemplars 2 and 3.

Phalp concludes his declaration by stating that the "unsolicited, outbound
telemarketing calls to Med4Home customers placed by Fleming, Schaefer, and Scales
yielded approximately 300 new write-ups of diabetic equipment and supplies per
month."  (DE 294-5 ¶ 9).  These write-ups (sometimes called "new patient setups")
indicate that "a sale is complete."  (Diabetic Experts call center supervisor Kim Smith
Oct. 1, 2014 Deposition DE 231-19 at 229:8–18).  But the basis for Relators' personal

knowledge of what happens between the time a sale is "complete" and the time a claim is presented to or paid by the government is not clear or even explicitly discussed.

Relators do not aver that they possess specific knowledge about the process by which Diabetic Experts submitted claims to the government or, in turn, received payment. It is undisputed that Phalp and Peoples both worked in sales. Relators neither spent time in billing while employed by Lincare, nor had any personal involvement with or any personal knowledge about the specifics of billing the government.

Not only did Phalp not work in billing and collections, but he also did not know anybody in that department.[16] (*See* DE 217-12 at 65:22–66:22). In fact, while Phalp understood the requirements of his job in sales, he was not familiar with other job functions. (*See* DE 217-12 at 67:3–11).

> Q:         I think you've indicated you were not familiar with what billing and collections employees did at Lincare, correct?
>
> Phalp:      Correct.

(DE 217-12 at 70:7-10).

> Q:         You don't know, for instance, whether the shipment was billed to Medicare, do you?
>
> Phalp:      I wasn't in the billing department, no sir.

(DE 217-13 at 146:11–15).

And while Phalp may have had some limited knowledge of billing protocols, Peoples knew no specifics regarding billing or collections:

---

[16] Relators' lack of knowledge regarding billing is consistent with Defendants' organizational structure. As Paula Boomershine, a regional billing collection manager responsible for Diabetic Experts, Med4Home, and Lincare, explained in her deposition, "[w]e did not do the submission [to Medicare]. It was all done at corporate through their setup there; so we didn't actually do the submission." (Paula Boomershine November 25, 2014 Deposition DE 231-28 at 16:17–19).

> Q:        You didn't have anything to do with billing or collections; is that correct?
>
> Peoples:    That's correct.
>
> Q:        Is it fair to say it was kind of a . . . larger operation of which you were just a part?
>
> Peoples:    Yes.

(DE 142-3 51:5–10).

Peoples' involvement ended once he placed an order for fulfillment.[17]  In his limited role, Peoples did not recall selling to Med4Home customers; he believed he had been hired to "mak[e] phone calls to Lincare patients" and did so using call sheets provided by Kim Smith, Diabetic Experts call center manager, that "came from a list of local Lincare patients." (DE 142-3 20:11-14, 23:1-10).  With the exception of calls based on purchased sales leads not pleaded in the SAC or at issue here, Peoples had no recollection of calling anyone other than Lincare customers.  (DE 142-3 132:22-134:4).

### D.    Other Evidence of the Scheme

In order to draw all reasonable inferences in favor of Relators, the Court will consider additional evidence of Relators' claims despite their contention that "Relators are, and have always been, the original source of the theory of liability for Diabetic [Experts]' telemarketing of these customers of Holdings' subsidiaries." (DE 303 at 10). For example, Maxine Fleming, one of the Diabetic Experts sales representatives who Phalp observed making unsolicited calls, has also submitted a declaration.  (Maxine

---

[17] *See* Peoples October 17, 2014 Deposition DE 142-3 50:3–6: "Well, I mean, as far as I know I placed the orders for shipment, but I didn't actually ship . . . or talk to the shipping department, no."

Fleming July 30, 2014 Declaration DE 100-4).[18]  In that declaration, Fleming states that

she worked at Diabetic Experts from April 2007 until March 2011.  (DE 100-4 ¶ 4).

During her time at Diabetic Experts, Fleming worked in close proximity with Relators

and other representatives in the single-room call center.  (DE 100-4 ¶ 5).  Her job was to

place calls to Medicare beneficiaries to encourage them to use Diabetic Experts as their

supplier of diabetic testing supplies.  (DE 100-4 ¶ 6).  To identify potential customers,

Fleming used a Holdings database that contained information about current Med4Home

customers.  (DE 100-4 ¶ 9).

Additionally, Diabetic Experts call center manager Kim Smith testified that she

hired Relators Phalp and Peoples as Diabetic Experts sales representatives to "call[]

Med4Home customers, people who received unit dose medication, to talk to them about

diabetics."  (DE 231-19 at 94:5–95:9).  To facilitate sales, Smith provided Phalp,

Peoples, Fleming, and other Diabetic Experts representatives with access to a database

of customer information as well as hard copy "call sheets"[19] that contained information

about current Med4Home and Lincare customers.  (DE 100-4 ¶ 11).  Smith reported on

---

[18] Relators have also submitted a September 16, 2009 statement by Ina Schaefer.  (DE 295-3).
The handwritten statement predates this litigation, was sent to Lincare, is not compliant with the
statute permitting the use of unsworn declarations (28 U.S.C. § 1746), and contains hearsay
regarding the alleged practice of shipping supplies before determining how many supplies the
beneficiary had on hand.  (DE 295-3 at 6–8); see Jones v. UPS Ground Freight, 683 F.3d 1283,
1293–94 (11th Cir. 2012).  There is no evidence in the New Exemplars that Diabetic Experts
continued shipping once they learned that the beneficiary wished to stop receiving diabetic
supplies.

[19] Smith created these call sheets of Med4Home customers by accessing information in a
database that she claims was inaccessible to Diabetic Experts sales representatives.  (See DE
231-19 at 136:5–138:9; see also Kent Hermes November 21, 2014 continued Deposition DE
231-9 at 330:22–331:20 (discussing database that was not accessible to Diabetic Experts
representatives)).  This fact—inaccessibility—is contradicted by the testimony of Phalp and
Fleming.  (Oct. 16, 2014 Gerry Phalp Deposition DE 217-13 at 175:20–22; 178:1–6; Maxine
Fleming July 30, 2014 Declaration DE 100-4 ¶ 9).  Accordingly and to the extent that it is
relevant, the Court assumes for this discussion that Diabetic Experts representatives could
access Med4Home customer information through a database.

14

Diabetic Experts' business in progress reports, which were produced during this case. During June 2007, Diabetic Experts "completed call-sheets for the Med4Home Medicare/Medicaid customers as well as the remainder of the call sheets for TX, FL, NY, and SC." (DE 231-27 at 4). During September 2007, Smith reported that Diabetic Experts had "primarily been calling on existing Lincare customers this month as opposed to Med4Home customers. We will continue on this path moving forward." (DE 231-27 at 10).

Lastly, Holdings' compliance department was aware of the sales strategy targeting Med4Home customers. Sean Schultz, a Vice President of Lincare, testified that he knew of the practice of calling Med4Home customers and that it had been cleared through Holdings' compliance department. (Sean Schultz January 6, 2015 Deposition DE 231-15 at 79:9–84:22).

## II.   APPLICABLE LAW

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014)).

After the movant has met its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 587. "[I]f the non-movant's response consists of nothing 'more than a repetition of his conclusional allegations,' summary judgment is not only proper, but required." *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1286 (M.D. Fla. 2009) (quoting *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981)) (granting defense summary judgment where relator lacked direct evidence that defendant caused false claims to be presented); *United States ex rel. King v. Solvay S.A.*, Case No. CV H-06-2662, 2015 WL 8732010, at *3 (S.D. Tex. Dec. 14, 2015) (granting defense summary judgment where circumstantial evidence was not sufficient to raise an issue of material fact as to a violation of the False Claims Act).

"Thus, to survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz*, 780 F.3d at 1050 (citing *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006)); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Matsushita*, 475 U.S. at 587) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). For cross-motions for summary judgment, the standard of review "simply

requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, Case No. 1:10-CV-1614-AT, 2015 WL 7293156, at *2 (N.D. Ga. Oct. 30, 2015) (citing *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)) (granting defendant's summary judgment motion where evidence showed that defendant reasonably interpreted Medicare rules).

The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted).  A non-movant relator cannot, however, survive summary judgment by relying on inferences unless he can "establish a sufficient factual basis to support his chain of inferences." *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 781 (S.D. Ohio 2014) (granting defendants' summary judgment in false claims act case alleging violations of the Anti-Kickback Statute).  This is because "[t]he Court may draw inferences in Relator's favor only to the extent supportable by the record." *United States ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, Case No. 1:11–cv–962–WSD, 2014 WL 2158412, at *4 (N.D. Ga. May 23, 2014) (citation omitted).

B.    **The False Claims Act**

As discussed in detail in the July Order, the False Claims Act imposes liability on any person who, *inter alia*:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim[20] for payment or approval; or

---

[20] "Claim" means "any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee, or agent of the United States; or is made to a

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729.  As to both counts alleged in the SAC, the Eleventh Circuit "caselaw is clear: the submission of a false claim is the *sine qua non* of a False Claims Act violation."  *Urquilla-Diaz*, 780 F.3d at 1052 (internal quotation and citation omitted). Thus, to prevail on a presentment claim, a relator must provide details of a link between improper practices and the submission of false claims.  *See United States ex rel. Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721 (11th Cir. 2012).  In the same vein, on a make-or-use claim, a relator must connect the improper practice with the government's payment.  *Urquilla-Diaz*, 780 F.3d at 1052 ("[T]o prevail on a claim under this subsection, the relator must prove that the government actually paid a false claim."); *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) (finding that there must be a falsehood that affects the government's willingness to pay, because "[i]mproper practices standing alone are insufficient.").

C.    **False Claims Requirements**

Although this case has advanced well beyond the Court's order denying Defendants' motion to dismiss, it nevertheless behooves the Court to briefly pause to consider the case authorities discussing pleading standards in qui tam matters to give context to the question of whether Relators have adduced sufficient evidence to create a genuine issue of fact regarding presentment or payment of false claims.  This is because, even at a relatively advanced stage, "prolix" filings that fail to specifically

---

contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded."  31 U.S.C. § 3729(b).

describe "key elements of fraud," are insufficient to maintain triable claims.  *Keeler*, 568

F. App'x at 784, 803 (affirming order that dismissed the third amended complaint three

years after the case was filed).  Courts focus on the submission or payment of a specific

*false* claim because, in False Claims Act cases, this is not merely a "ministerial act," but

rather is a critical element of the claim.  *United States ex. rel. Clausen v. Laboratory*

*Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *United States ex rel. Mastej v.*

*Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014) (internal citations

and quotations omitted; italics in original) ("Because the submission of an actual claim

to the government for payment is the *sine qua non* of an FCA violation, a plaintiff-relator

must plead the submission of a false claim with particularity.").  Furthermore, requiring

relators to precisely articulate a specific fraud "deters the use of complaints as a pretext

for fishing expeditions of unknown wrongs designed to compel in terrorem settlements."

*United States ex rel. Wilson v. Crestwood Healthcare, L.P.*, Case No. CV-11-S-3361-

NE, 2012 WL 1886351, at *4 (N.D. Ala. May 18, 2012) (dismissing qui tam complaint

with prejudice).

     At the summary judgment stage, the plaintiff relator must do more than point to

some possibility—"a mere scintilla"—that false claims were actually submitted or paid.

*Urquilla-Diaz*, 780 F.3d at 1050 (citation omitted).  To survive summary judgment, the

non-movant relator "must make a showing sufficient to permit the jury to reasonably find

on its behalf."  *Id.*  This showing could be made by presenting exemplar claims that

permit a court to determine liability before considering damages.  But the summary

judgment standard could also be met by a plaintiff-relator without documentary

evidence; there is no per se rule requiring exemplars or sample claims.  Without

exemplar claims submitted to the government, a relator could survive a summary judgment challenge by showing that he held a position and performed a work function that allows him to demonstrate—with specificity and from personal knowledge—that false claims were submitted to or paid by the government.

III.     APPLICATION

The procedural posture of this case is unusual.  The Court found that, with the addition of the Original Exemplars to the operative pleading, "the allegations in the Second Amended Complaint at least **minimally** state a cause of action."  (DE 56 at 8) (emphasis added).  But subsequently, in the July Order, the Court granted summary judgment to Defendants on all six Original Exemplars—the specific claims that had lent credibility to Relators' claims and "propelled" the SAC over the Eleventh Circuit's qui tam pleading hurdles.  (DE 283 at 58); *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 801 (11th Cir. 2014).

Now, in response to the Court's query regarding the existence and viability of any remaining claims, Relators have produced three New Exemplars of calls to Med4Home beneficiaries.  With regard to the Court's finding in the July Order that claims regarding Med4Home, Inc. were not pleaded with specificity in the SAC,[21] Relators point out that Med4Home is not an unpleaded defendant, but is rather another source of beneficiaries for whom Diabetic Experts submitted false claims.  The Court assumes, without deciding,[22] that this pleading deficiency is not fatal to the claims and, drawing all

---

[21] (DE 283; *see generally* SAC DE 43).

[22] It bears noting that even in the context of allowing amendments to conform the pleadings to evidence, a district court's discretion in deciding whether to allow a new issue to be injected into the proceedings is not unlimited.  *See Diaz v. Jaguar Restaurant Group, LLC*, 627 F.3d 1212, 1214 (11th Cir. 2010) (reversing district court for allowing party to raise new issue at trial).

reasonable inferences in favor of Relators, the Court now considers the New

Exemplars.

### A.    Claims Before the Court

Relators contend that one general fact is "beyond dispute on this record":

Diabetic placed unsolicited telephone calls to Medicare beneficiaries who were customers of Med4Home, and sold them diabetic testing supplies for which Diabetic **submitted at least one claim to, and received payment from, Medicare** between April 1, 2007 and November 1, 2012.

(DE 294 at 4) (emphasis added).  Defendants point out that there is no record,

supplemental or otherwise, that any improper "calls actually were made to patients of

either Med4Home or Reliant that resulted in the submission of claims that were paid by

the government."  (DE 301 at 20 n.27).  Relators implicitly acknowledge that their

assumption lacks a factual basis, but counter that they are only limited in presenting

specific claims regarding Med4Home because "Defendants have refused to provide the

claims data for calls made to Med4Home."  (DE 297 ¶ 19).

This deficiency cannot, as Relators suggest, be attributed solely to Defendants'

failure to produce discovery because a relator has an obligation to identify and articulate

the foundational elements of the fraud with specificity at the time of filing the complaint.

See *Keeler*, 568 F. App'x at 806 (quoting *Clausen*, 290 F.3d at 1313) ("[T]he Eleventh

Circuit warned of a situation where 'a plaintiff does not specifically plead the minimum

elements of their allegation, [and is able] to learn the complaint's bare essentials

through discovery.'").  Qui tam cases are distinguished from other legal actions in that

relator-plaintiffs must possess this information *before* discovery has taken place.[23]  And

_____

[23] Notably, in the context of the public disclosure bar under 31 U.S.C. § 3730(e)(4), the Supreme Court also does not permit a relator with direct and independent knowledge about one

it is unreasonable to infer that Diabetic Experts "submitted at least one claim to, and received payment from, Medicare," because in the absence of a factual record, courts "cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government." *Clausen*, 290 F.3d at 1312 n.21.

Of the three New Exemplars, only New Exemplar 1 has been in Relators' possession since the outset of the case. New Exemplars 2 and 3 bear bates stamps indicating that they were produced by Defendants during the course of discovery (DE 295-4, 295-5) and Defendants have demonstrated that the documents identified here as New Exemplars 2 and 3 were provided to Relators by Defendants in this case. (Christy Andra October 8, 2015 Declaration DE 299-1 ¶ 3).[24]

Relators cite to a decision from the Fifth Circuit, *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, for the proposition that, once a case has proceeded beyond the motion to dismiss stage, Defendants cannot argue that Relators' claims lack sufficient specific facts to continue. *Rigsby*, 794 F.3d 457 (5th Cir. 2015). Essentially, Relators argue that the Court should not foreclose a potentially viable claim by ignoring the developments of the litigation and "rewinding" events to the time the operative pleading was filed. *Rigsby*, 794 F.3d, at 466. But the decision in *Rigsby* is distinguishable both on the facts and the law.

---

discrete fraud to use a qui tam complaint as a vehicle to "claim smuggl[e]" other false claims. *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 476 (U.S. 2007).

[24] Permitting Relators to learn the "bare essentials" of their case in discovery is not only inconsistent with courts' "important gatekeeping function where FCA claims are involved," but also an incentive to file speculative qui tam suits. *Keeler*, 568 F. App'x at 801 n.23 ("A line of decisions from the Eleventh Circuit—*Clausen*, *Corsello*, *Atkins*, and *Solvay*—make clear that this court has an important gatekeeping function."); *see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 220, 229, 231 (1st Cir. 2004). Nevertheless, as noted above, the Court considers the New Exemplars together in order to draw all reasonable inferences in favor of Relators.

First, the *Rigsby* relators won their test claim, *i.e.* exemplar, while Relators here lost on the Original Exemplars.  Significantly, in *Rigsby*, the relators survived summary judgment scrutiny before proceeding to a jury trial, where "the Rigsbys **prevailed** on a single bellwether false claim under the FCA."  *United States ex rel. Rigsby v. State Farm Ins. Co.*, Case No. 1:06CV0433 LTS-RHW, 2009 WL 2461733, at *1 (S.D. Miss. Aug. 10, 2009) (treating defendants' motions to dismiss "as motions for summary judgment" and denying); *Rigsby*, 794 F.3d at 462 (emphasis added).

There, despite a trial record supporting "a high probability that State Farm submitted more than one false claim," the district court had denied relators' request to conduct additional discovery regarding claims like the exemplar.  *Rigsby*, 794 F.3d at 469.  On that record, the Fifth Circuit reversed, stating "that our decision hinges in large part on the idiosyncratic nature of this case—seldom will a relator in an FCA case present an **already-rendered jury verdict in her favor** while seeking further discovery."  *Id.* at 469–70 (emphasis added).

Second, although the Eleventh Circuit has acknowledged that the Fifth Circuit "criticize[s] the stringent requirements of *Clausen*," it has repeatedly reaffirmed *Clausen*'s principles.  *Compare Rigsby*, 794 F.3d at 467 n.6 ("We hasten to add here that we have recently suggested, in the post-*Grubbs*[25] FCA context, that additional discovery might be employed to permit plaintiffs to cure certain defects in a complaint."), *with Keeler*, 568 F. App'x at 797 n.19 (noting that *Clausen* remains "binding precedent").  Thus, even as arguably persuasive precedent, *Rigsby* is of limited value because of the "idiosyncratic nature" of the case.  *Rigsby*, 794 F.3d at 469.  Nevertheless, the Court

---

[25] *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009).

has considered the development of this litigation; it is one reason that the Court has permitted Relators' supplement and the Court now considers the New Exemplars.

### B.     The New Exemplars Do Not Support False Claims Act Liability

The gravamen of a False Claims Act claim is the submission of a *false* claim. *Urquilla-Diaz*, 780 F.3d at 1052 ("[O]ur caselaw is clear."). Merely alleging a colorable claim that a statute relevant to Medicare has been violated is not sufficient. It is the submission or payment of a false Medicare claim, use of records known to be false, and false certification of compliance with the laws that create False Claims Act liability. *See Mastej*, 591 F. App'x at 706; *A1 Procurement, LLC v. Hendry Corp.*, Case No. 11-23582-CIV, 2012 WL 6214546, at *4 (S.D. Fla. 2012) ("A fundamental requirement of the FCA, regardless of the section allegedly violated, is that the false or fraudulent claims or statements at issue must be objectively false.").

Relators here correctly identify the dispositive issue: "absent valid consent to contact, the telemarketing of Med4Home . . . beneficiaries by Diabetic Experts violates the [statute] and therefore the False Claims Act." (DE 303 at 5). It is unrebutted that each of the New Exemplars contains consent to contact by "supplier and its affiliates." The question is whether Diabetic Experts violated a Medicare statute, regulation, or rule when it used a broadly worded consent allowing contact by "supplier and affiliates" to contact a customer of a Lincare affiliate to offer them diabetic supplies.

Diabetic Experts is a subpart of Lincare. Med4Home is a wholly owned subsidiary of Lincare, which is, in turn, a subsidiary of Holdings. (Don Crisp Nov. 21, 2014 continued Deposition DE 231-8 110:1–16, 170:7–172:5; Holdings & Subsidiaries Entity Structure 2008 and 2009 DE 100-11 at 2–3). There can be no dispute that

Diabetic Experts is an affiliate of Med4Home because they are related by ownership. *See* 42 C.F.R. § 424.57(a).

The statute, 42 U.S.C. § 1395m(a)(17)(A)(i), expressly provides that a supplier may make telephone contact with a beneficiary if: "(i) [t]he individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item." Relators contend that consent to contact that was given when the customer was provided with unit dose medication or oxygen supplies and equipment cannot serve as consent when the entity or affiliate given the consent contacts the customer regarding diabetic supplies.

Relators have not presented the Court with any authority supporting the conclusion that Diabetic Experts was proscribed from contacting customers who consented to being contacted by "supplier and its affiliates." Accordingly, the Court focuses on the statutory text and proceeds from the "understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (citation omitted). It is well established that statutory interpretation begins with the language of the statute and if the statutory language is clear, the inquiry ends. *See King v. Burwell*, --- U.S. ----, 135 S. Ct. 2480, 2489 (2015). A court's construction should avoid rendering any clause, sentence, or word superfluous, void, or insignificant. *See United States v. Aldrich*, 566 F.3d 976, 978 (11th Cir. 2009).

A supplier is prohibited from making unsolicited telephone contacts with individual customers who are enrolled in Medicare unless:

> (i) The individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item.

(ii) The supplier has furnished a covered item to the individual and the supplier is contacting the individual only regarding the furnishing of such covered item.

(iii) If the contact is regarding the furnishing of a covered item other than a covered item already furnished to the individual, the supplier has furnished at least 1 covered item to the individual during the 15-month period preceding the date on which the supplier makes such contact.

42 U.S.C. § 1395m(a)(17).  All three New Exemplars contain consents to contact in the AOBs, which engages the first exception.  *See* 42 U.S.C. § 1395m(a)(17)(i).

Exception (i) contains three elements.  The first, written permission, is easily fulfilled.  Each New Exemplar contains a signed AOB with consent to contact: "The undersigned, as or on behalf of Patient, agrees that Supplier and its affiliates may contact Patient at the telephone number specified hereon."  (*See, e.g.*, DE 301-1 at 7).

The second element of exception (i) is who can make contact.  The Medicare beneficiaries in the New Exemplars gave consent for "Supplier and its affiliates" to call.  The "Supplier" in the New Exemplars is, under Relators' theory, Med4Home.[26]  Diabetic Experts may use the consent as an affiliate of the supplier because it is related to Med4Home by Lincare's ownership.

The third element of exception (i) concerns what topics an entity that has received consent can contact beneficiaries to discuss.  Relators seem to argue that the statute's "regarding furnishing of a covered item" language is not meant to apply to Medicare covered items generally, but rather is meant to restrict the consent to already furnished items.  Relators' argument tracks their AOB item specificity argument that the

---

[26] As discussed above, it is possible that the "Supplier" in New Exemplar 1 is, in fact, Lincare.  If the "Supplier" is Lincare, Diabetic Experts may use the consent as the supplier because it is a subpart of Lincare.

Court rejected in the July Order.[27]  The argument is that even if Diabetic Experts were permitted to contact Med4Home customers, it could only do so regarding the covered items, or perhaps ones of the same type, that Med4Home had already supplied.  The Court has not been provided, and the Court's research does not reveal, any authority for this interpretation of the statute.

In addition, Relators' interpretation does not give effect to the entire statute.  If Relators are correct, then exception (i) would become superfluous because exception (ii) already permits contact regarding previously furnished items.  Exception (i) refers to "a covered item" while exception (ii) refers to "such covered item."  42 U.S.C. §§ 1395m(a)(17)(i–ii).  The text plainly permits an entity to contact a beneficiary— without written consent—regarding covered items that were already furnished.  For example, no written consent is needed for the entity to call to ask if the beneficiary is satisfied with the oxygen previously supplied.  In contrast, a consent is required if the entity is calling about another Medicare covered item.[28]

Although Relators cite to current CMS guidance, this does not appear to buttress their argument.  Those FAQs provide in pertinent part:

Question 1: Under what circumstances can a DME supplier make telephone contact with a beneficiary regarding a Medicare covered item?

Answer 1: **If the beneficiary gave written permission for the supplier to contact him/her**, if the supplier has already provided a covered item to

---

[27] The Court has also considered Relators' citations to the Federal Register concerning "Beneficiary Signature for Nonemergency Ambulance Transport Services" and a failed proposal to eliminate the "assignment of benefits form" for diabetic supplies.  (*See* DE 216-2; 217-16).  The citations do not persuade the Court to revisit its ruling on Relators' item specificity argument.

[28] But, if another covered item was provided within the last 15 months, no consent is required. 42 U.S.C. § 1395m(a)(17)(iii).  It is not clear how Relators' proposed interpretation of "covered item" would function in the context of the 15-month contact window provided by exception (iii).

the beneficiary and the supplier is calling the beneficiary about such covered item or if the beneficiary has already received a covered item from the supplier in the last 15 months.

*      *      *

Question 3: If a supplier makes solicited contact with a beneficiary for a particular covered item, can the supplier speak with the beneficiary about additional covered items during that same contact?

Answer 3: **No. If this is the first contact ever made by the supplier to the beneficiary**, then the supplier is prohibited from attempting to solicit the purchase of additional covered items since the supplier only had permission to contact the beneficiary regarding the particular covered item prescribed by the physician. **Once the supplier has provided the covered item to the beneficiary, then the exceptions listed in A1 above may be applied.**[29]

Here, there is consent to call. And Defendants argue that CMS-endorsed, form AOB language ("I request payment of authorized Medicare benefits to me or on my behalf for any services furnished by (supplier)") invites the use of broad language in both assignments and consents. (DE 75 ¶ 29). The first exception listed in the statute and discussed in FAQ Question 1 applies. Accordingly, the Court finds that Diabetic Experts' practice of calling customers of its affiliate who had consented to contact by affiliates as represented by the New Exemplars are not violations of the statute that could create an objectively false claim when presented to the government.[30]  However,

---

[29] https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/Downloads/DMEPOSTelemarketingFAQs.pdf (last viewed Nov. 18, 2015) (emphasis added).

[30] New Exemplar 1 is not false for an additional reason not applicable to New Exemplars 2 and 3.  New Exemplar 1 indicates that Diabetic Experts called on a Lincare customer who had also received unit dose medication, potentially from Med4Home.  For the reasons set forth in the Court's July Order, there is no False Claims Act liability if the customer received a covered item from Lincare in the previous 15 months.  The unrebutted October 13, 2015 Pedersen Affidavit (DE 301-1 at 2–3) demonstrates that Lincare furnished a covered item on February 14, 2008 and Diabetic Experts made the call on May 11, 2009.

because an exemplar is merely one way of making a showing sufficient to defeat summary judgment, the Court will also evaluate Relators' personal knowledge.

### C.   Relators Lack Sufficient Relevant Knowledge to Create a Fact Issue

Relators contend that they are not required to provide exemplars because Relators' personal knowledge creates an issue of fact that precludes summary judgment for Defendants. Yet in this case, Relators cannot explain the basis for their assertions that fraudulent claims were actually submitted. While Relators steadfastly maintain that they have personal knowledge of the false claims submitted during the course of Defendants' allegedly fraudulent scheme, they acknowledge that they have scant knowledge about claims generated by calls to Med4Home customers. And Relators admittedly have absolutely no knowledge regarding billing and payment. This is insufficient at the summary judgment stage. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587.

What little personal knowledge Relators do have is presented in their depositions and the recent Phalp declaration included with Relators' motion to supplement. Phalp asserts that he "personally observed three sales representatives of Diabetic Experts make unsolicited, outbound sales calls to customers of Med4Home to sell diabetic equipment and supplies using the Lincare Holdings database to facilitate those calls." (DE 294 at 6; 294-5 ¶ 4). Phalp concludes his declaration by stating that the unsolicited telemarketing calls to Med4Home customers placed by Fleming, Schaefer, and Scales "yielded approximately 300 new write-ups of diabetic equipment and supplies per month." (DE 294-5 ¶ 9).

Besides being conclusory, Phalp's testimony regarding the number of "write-ups" is immaterial because Relators do not provide the final link with billing, claims, and payment.  As their depositions make clear, Relators cannot establish that connection. (Peoples Depo. DE 142-3 52:1–5) ("It sounds like you basically were in charge of . . . making sales calls, but other than that, you really didn't have any involvement in the rest of the process.  Is that fair? Yeah."); (Phalp Depo. DE 217-13 at 146:11–15) ("You don't know, for instance, whether the shipment was billed to Medicare, do you? . . . [N]o sir."); (Peoples Depo. DE 142-3 50:3–6) ("Well, I mean, as far as I know I placed the orders for shipment, but I didn't actually ship . . . or talk to the shipping department, no.").  And neither Relator had any general experience with billing.  Phalp knew no one in the billing department or even the job responsibilities and functions of those employees.  (Phalp Depo. DE 217-12 at 65:22–66:22; 67:3–11; 70:7–10).  Peoples demonstrated the same lack of knowledge.  (Peoples Depo. DE 142-3 50:15–16).

Relators were not high-level managers like the vice president and CEO relator in *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, who accessed information about billings, revenues, and payor mix, and attended management meetings where Medicare patients and the submission of claims to the government were discussed. *Mastej*, 591 F. App'x at 708.  Relators did not have access to a centralized billing system like the center manager relator in *United States ex rel. Thayer v. Planned Parenthood of the Heartland.  Thayer*, 765 F.3d 914, 919 (8th Cir. 2014).  Relators' status is more similar to that of the psychiatrist relator in *United States ex rel. Atkins v. McInteer*, who was responsible for the provision of medical care, but could not provide specific information regarding billing and submitting claims for reimbursement. *Atkins*,

470 F.3d 1350, 1359 (11th Cir. 2006).  And Defendants here are distinguished from those in *United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.* because Lincare and Holdings have made no admission regarding submission to, or payment from, the government of non-compliant claims.  *Walker*, 433 F.3d 1349, 1354 (11th Cir. 2005).

Thus, the issue is not, as Defendants assert, that Phalp's declaration is procedurally improper or rests on a faulty evidentiary foundation.  The Court need not delve into those questions because Relators simply lack knowledge regarding critical topics.  Although Phalp's declaration establishes that he knew sales calls were made, that knowledge is, at best, only a piece of the claim.  Neither Relator has personal knowledge of the billing, claims submission, or government payment components of the false claims.

Relators argue that the Kim Smith progress reports and yearly revenues for Diabetic Experts compensate for this deficiency and compel the conclusion that Defendants were submitting false claims.  But the Court cannot draw this conclusion in the absence of facts that the revenues were generated by outbound telemarketing calls to Med4Home customers that Defendants made when they did not have the customers' consent.  To the contrary, the evidence before the Court compels the opposite conclusion; the Court has only seen calls to Med4Home customers who gave their consent.  Therefore, even with the supplemented record, evidence of Relators' relevant personal knowledge is insufficient and a rational trier of fact could not find for Relators that Defendants either presented or were paid for a false claim.  *Urquilla-Diaz*, 780 F.3d at 1050.

31

IV.     CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Relators' motion for partial summary judgment.  Without reaching the issue of scienter, the Court concludes that Lincare did not violate[31] the False Claims Act by contacting Medicare beneficiaries who consented to contact.  As a corollary, Holdings did not violate the False Claims Act by sharing patient information and documents with Diabetic Experts so that Diabetic Experts could contact those beneficiaries who had consented to contact.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Relators Matt Peoples and Gerry Phalp's motion for partial summary judgment (DE 217) is **DENIED**.

2. Defendants Lincare Holdings, Inc. and Lincare, Inc. d/b/a Diabetic Experts of America's motion for summary judgment (DE 220) is **GRANTED**.

3. The Court further finds that Relators' claims were not "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment," and declines to entertain motions for attorneys' fees and expenses. *See* 31 U.S.C. § 3730(d)(4).

4. All motions to seal are **GRANTED**.  The Parties shall contact the clerk's office within 1 year of this order to make provision for handling and disposal of all sealed materials filed in the case.

5. All other pending motions are **DENIED AS MOOT**.

---

[31] The Court reiterates its observation in the July Order that this finding under the False Claims Act does not constitute an approval of Defendants' business practices.  If the appropriate agency were concerned with the manner in which Defendants engaged with their customers, it could always initiate proceedings directed to Defendants' eligibility to participate in Medicare.  But, absent false claims, that is not the purview of a district court.  *See* 42 U.S.C. § 1395m(a)(17)(C); 42 C.F.R. § 424.57(e); *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 717 (6th Cir. 2013) (noting that "compliance may of course be enforced administratively through suspension, disqualification, or other remedy."); *see also* Additional (DMEPOS) Supplier Enrollment Safeguards, 75 Fed. Reg. at 52631 ("We believe that if CMS or the NSC through on-site inspection obtains or develops evidence that a DMEPOS supplier has made prohibited contacts with Medicare beneficiaries in violation of the provisions found in this section that CMS or the NSC may revoke that supplier's billing privileges.").

6.  The Clerk is directed to **CLOSE** the case.

7.  The Court will enter a separate judgment following this order pursuant to Fed. R. Civ. P. 58.

**DONE and ORDERED** in Chambers at Miami, Miami-Dade County, Florida, this

11ᵗʰ day of January, 2016.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE